UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

JENNIFER GONZALES,

        Plaintiff,

    v.

BARRETT BUSINESS SERVICES, INC., a Maryland Corporation,

        Defendant.

NO.  CV-05-0104-EFS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING AS MOOT IN PART DEFENDANT'S MOTION *IN LIMINE*, GRANTING PLAINTIFF'S MOTION *IN LIMINE*, AND OVERRULING DEFENDANT'S OBJECTION TO PLAINTIFF'S PROPOSED EXHIBIT NO. 22**

On May 18, 2006, the Court held a motion hearing in the above-captioned case. Plaintiff Jennifer Gonzales was represented by Carol Volyn, and William Grimm appeared on behalf of Defendant Barrett Business Services, Inc. ("BBSI"). During the hearing, the Court heard argument on BBSI's Motion for Summary Judgment (Ct. Rec. 21), Plaintiff's Cross-Motion for Partial Summary Judgment (Ct. Rec. 32), BBSI's Motion *in Limine* (Ct. Rec. 42), Plaintiff's Motion *in Limine* (Ct. Rec. 45), and BBSI's Objection to Plaintiff's Proposed Exhibit No. 22 (Ct. Rec. 44). After hearing argument, the Court issued oral rulings on several of the issues raised in the parties' respective motions. This Order serves to memorialize and supplement those oral rulings.

ORDER-- *1*

# I. Background[1]

## A. Plaintiff's Hiring & the Transition from SRML to BBSI

In February 2003, Plaintiff was hired as a receptionist by Skills Resource Training Moses Lake ("SRML"). (Ct. Rec. 35 ¶ 3.)  When Plaintiff was hired, SRML was owed by Jeff Krug and the Moses Lake office of SRML - where Plaintiff worked - was managed by Larry Masengale. (Ct. Rec. 26 ¶ 2.)  Effective January 1, 2004, SRML was acquired by BBSI. *Id.* ¶ 2.  BBSI, like SRML, is a staffing services and human resource management company. (Ct. Rec. 25 ¶ 2.)  BBSI provides its customers with long and short term staffing, on-site management, contract staffing, and staff leasing. *Id.*

In connection with BBSI's acquisition of SRML, Mr. Krug became employed by BBSI as BBSI's Branch Manager for its Eastern Washington offices. (Ct. Rec. 26 ¶ 3.)  As Branch Manager, Mr. Krug made the initial hiring decisions regarding BBSI's staffing needs in the Moses Lake office. *Id.*  One of his first decisions was to offer Plaintiff a "customer service representative" position.[2] *Id.*  This offer, which was accepted by Plaintiff on December 26, 2003, when she signed her BBSI Employment Agreement, became effective on January 1, 2004. (Ct. Rec. 27 Ex. 11.)

---

[1] In ruling on a motion for summary judgment, the Court considers the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (*per curiam*).  The following factual recitation was created with this standard in mind.

[2] The position of "customer service representative" is also referred to as "account coordinator" by the parties.  For the purposes of this Order, the Court will at all times refer to this position as a customer service representative.

ORDER-- *2*

According to her Employment Agreement, Plaintiff's principal duties were "to interface with and assimilate new business activity while playing a key role in coordinating operational resources, coordination of new account start-up, and day-to-day operations." *Id.* ¶ 1.  In addition, Plaintiff was to "perform other related duties that may he (sic) assigned from time to time by [BBSI's] management." *Id.* Plaintiff's key responsibilities included (1) taking applications from individuals interested in being hired by BBSI and placed in temporary jobs offered by BBSI's customers, (2) conducting background checks and skill assessments of those applicants, (3) hiring BBSI's temporary employees, (4) placing the temporary employees in temporary positions with BBSI's customers, (5) disciplining and terminating BBSI's temporary employees when problems arose with them at BBSI's customers' work sites, (6) introducing the BBSI's temporary employees to BBSI's customers' work site leads, (8) creating BBSI's temporary employees' work schedules, and (9) assorted office tasks, e.g. copying, answering telephones, and cleaning. (Ct. Rec. 27 at 3-7.)

As compensation, Plaintiff was to be paid a salary of $22,100.00 per year and allowed to participate in the "Barrett branch staff profit sharing program."[3] *Id.* ¶ 3.  The Employment Agreement also stated that Plaintiff's employment with BBSI could be "voluntarily terminated by Employee or Company upon notice to the other party" and that there was "no promise of any sort, implied or otherwise, of employment for a specified or assumed period of time." *Id.* ¶ 5.1.

---

[3] In June 2004, Plaintiff's salary was raised to $26,364.00 per year. (Ct. Rec. 26 ¶ 4.)

ORDER-- *3*

Sometime shortly after beginning her employment with BBSI, Plaintiff received a copy of BBSI's Management Employee Manual ("Employee Handbook"). (Ct. Rec. 36 Ex. 1 at 16.) At the time Plaintiff was presented with the Employee Handbook, she was not provided with any additional compensation, bonus, training, or other consideration. (Ct. Rec. 26 ¶ 8.) The Employee Handbook and an Acknowledgment of Receipt, which was signed by Plaintiff, included the following disclaimer:

> Your employment with Barrett is at-will. This means that neither you nor Barrett has entered into a contract regarding the duration of your employment. You are free to terminate your employment with Barrett at any time, with or without reason. Likewise, Barrett has the right to terminate your employment, or otherwise discipline, transfer, or demote you at any time, with or without reason, at the discretion of Barrett.

> No employee of Barrett Business Services, Inc. can enter into an employment contract for a specified period of time, or make any agreement contrary to this policy without prior written approval from the President/CEO of the Company.

(Ct. Recs. 27 Ex. 15 at 2-1 & Ex. 16.) In addition, directly above the place where Plaintiff signed the Acknowledgment of Receipt, it stated:

> I have received and read a copy of the Barrett Employee Manual. I understand that the policies and benefits described in it are provided to the employees of the Company at its sole discretion, unless required by law, and may be modified or eliminated at any time by the Company.

*Id.* at Ex. 16. The Employee Handbook also contained policies prohibiting workplace harassment and retaliation for reporting harassment. *Id.* at Ex. 15 at 2-2, 2-3, & 2-4.)

In April 2004, Mr. Krug hired Jeffrey Wiberg as an "in-house temp" for a new account BBSI had acquired. (Ct. Rec. 36 Ex. 2 at 12 & 14.) When hired, Mr. Wiberg performed many of the same tasks performed by Plaintiff as a customer service representative. *See id.* at 12-14. While

ORDER-- *4*

working as an "in-house temp," Mr. Wiberg was paid $12.50 per hour and received compensation for working overtime. *Id.* at 13-14.  In June 2004, Mr. Krug promoted Mr. Wiberg to the position of Location Manager of the Moses Lake office. (Ct. Rec. 26 ¶ 5.)  As Location Manager, Mr. Wiberg became a salaried employee and Plaintiff's direct supervisor. *Id.*

**B. Plaintiff's Problems with Sarah Earley**

In August 2004, Plaintiff complained to Mr. Wiberg about the way she was being treated by Sarah Earley,[4] who was a payroll clerk in the Moses Lake office. (Ct. Rec. 25 ¶ 3.)  According to Plaintiff, Ms. Earley "caused repeated conflict with customers and BBSI employees." (Ct. Rec. 35 ¶ 12.)  In support of this assertion, Teresa Garay, a secretary who previously worked in the Moses Lake office with Plaintiff and Ms. Earley, claims Ms. Earley's "behavior to BBSI employees was outrageous" and that she "was constantly harassing female employees in the office," including Ms. Garay and Plaintiff. (Ct. Rec. 64 ¶ 9.)

After receiving Plaintiff's complaint about Ms. Earley, Mr. Wiberg claims to have conducted an investigation and determined that both women were at fault. (Ct. Rec. 25 ¶ 3.)  For that reason, Mr. Wiberg gave both Plaintiff and Ms. Earley written disciplinary warnings. *Id.*  In his August 19, 2004, written warning to Plaintiff, Mr. Wiberg stated:

> You called me w/o addressing your problem first.  Your issues were shared with others in the office - not contributory to our goal for a team atmosphere.  Your observations of your co-worker were based on suspicion & conjecture[,] rather than fact & reality - thus contributing to an atmosphere of suspicion & causes inter-office politics.

---

[4] BBSI refers to this individual as Sarah Earley, while Plaintiff refers to her as Sarah Hermann.  For the purposes of this Order, the Court will at all times refer to this individual as Sarah Earley.

ORDER-- *5*

*Id.* at Ex. 4.   Mr. Wiberg's corrective action was to reevaluate Plaintiff in two weeks. *Id.*

In turn, Mr. Wiberg's August 24, 2004, written warning to Ms. Earley's stated:

> Your level of professionalism and courteousness has been lacking when it comes to communicating with your co-workers. As we have discussed - you need to present your problems in a constructive way when you have issues with one or more of your co-workers.
>
> You cannot assume that others are not busy and waiting to help you - you need to be more respectful of others' time constraints and be understanding of all their "pressures" without criticism.

*Id.* As corrective action, Mr. Wiberg asked Ms. Earley to:

> Ensure courteous communication with all of [her] co-workers. Concentrate on [her] choice of presentation and be wise about when [she chose] to talk with them - Meaning: Look closely if [she] and they are cool enough to speak with.  Use please / thank you / & do you have time?

*Id.*

Plaintiff's August 19, 2004, written disciplinary warning to Plaintiff was followed-up with a three page letter to Plaintiff on August 25, 2006, in which Mr. Wiberg (a) clarified the message he intended to convey in the written warning, (b) complimented what he believed were Plaintiff's professional strengths, and (c) encouraged Plaintiff to remain with BBSI out of concern she may quit. (Ct. Rec. 56 Ex. 5.)  Then, on September 3, 2004, Mr. Wiberg wrote Plaintiff another letter, which was to memorialize the two-week reevaluation referenced in Plaintiff's written warning. *Id.* at Ex. 6.  In this letter, Mr. Wiberg indicated he had "witnessed a drastic change and improvement" on Plaintiff's behalf and that he felt the Moses Lake office was "returning to an atmosphere of cooperation and celebration of each persons (sic)

ORDER-- *6*

successes." *Id.*  The letter concluded with Mr. Wiberg explaining that he did not believe any further evaluation of the matter would be needed. *Id.*

Plaintiff alleges Mr. Wiberg and Ms. Earley were engaged in a romantic relationship and that this relationship led Mr. Wiberg to provide Ms. Earley with preferential treatment.  However, the only evidence offered to support this assertion are Ms. Garay's observations that (1) Mr. Wiberg and Ms. Earley spent long periods of time in Mr. Wiberg's office with the door closed and locked, (2) Mr. Wiberg and Ms. Earley took long lunches together, and (3) Ms. Earley "was readily observed flaunting her breasts to Wiberg in a very flirtatious manner, with Wiberg flirting back." (Ct. Rec. 64 ¶ 13.)  In addition, Ms. Garay claims Mr. Wiberg begged Ms. Earley to stay with BBSI when Ms. Earley indicated she may leave the company and that Ms. Earley was ultimately given a pay raise by Mr. Wiberg to ensure she would remain with BBSI. *Id.* ¶ 14.

## C. Mr. Wiberg's Alleged Discriminatory Statements

After Plaintiff complained to Mr. Wiberg about Ms. Earley, she and co-worker Ms. Garay claim Mr. Wiberg made the following comments: (1) "BBSI should stand for 'big booby incorporated'"; (2) "I'm never going to hire another girl in this office because, look at you guys."; (3) "You know you're a good boss when the husbands like you"; and (4) "Moms should be home with their kids". (Ct. Recs. 35 ¶ 19; 36 Ex. 1 at 83-88; 36 Ex. 3 at 18; 64 ¶ 11.)  BBSI disputes that these statements were made by Mr. Wiberg. (Ct. Rec. 57 ¶ 7.)

///

ORDER-- 7

**D. Mr. Morrison's Hiring**

In mid-September 2004, approximately one week prior to Plaintiff's below-described suspension and termination, Mr. Wiberg hired Matt Morrison, a man, to work in BBSI's Moses Lake office as a "management temp." (Ct. Rec. 36 at 47 & 77.)  Mr. Wiberg, who had known Mr. Morrison for approximately ten years, encouraged Mr. Morrison to apply for the open BBSI position. *Id.* at 77.  After his hiring, Mr. Morrison assisted Plaintiff with her Othello Simplot obligations. *Id.* at 78.  Mr. Morrison explains that his involvement with the Othello Simplot contract was intended to alleviate Plaintiff's extra-workload and to provide him with training. *Id.*  After Plaintiff's employment was terminated, just one week after Mr. Morrison's hiring, Mr. Morrison took over the Othello Simplot duties. *Id.* at 79.

Mr. Morrison continued as a "management temp" until January 2005, when he was promoted to the position of customer service representative, which was the position held by Plaintiff prior to her termination. *Id.* at 77.  Prior to Mr. Morrison's promotion, Plaintiff was paid at the hourly rate of $10.00 per hour. *Id.*  After his promotion, Plaintiff was paid a salary of $32,000.00 per year. *Id.*

**E. Plaintiff's Suspension & Termination**

On September 20, 2004, Plaintiff's employment with BBSI was suspended by Mr. Wiberg allegedly at the direction of Mr. Krug. (Ct. Recs. 25 ¶ 5 & 26 ¶ 6.)  In a December 7, 2004, letter to Plaintiff's counsel, Mr. Krug stated that Plaintiff's employment was "suspended for insubordination, failure to comply with her Supervisor's reasonable request." (Ct. Rec. 48 Ex. 14.)  More specifically, Mr. Wiberg explained

ORDER-- *8*

during his deposition that Plaintiff's employment was suspended because she contacted Lennis Krug,[5] a client representative for a customer serviced by BBSI, after Mr. Wiberg had expressly told her not to. (Ct. Rec. 36 Ex. 2 at 41.)

According to Mr. Wiberg, Ms. Krug contacted Plaintiff to express concerns with the service her company was being provided under its BBSI contract. *Id.* In response to this call, Plaintiff contacted Mr. Wiberg, who allegedly instructed Plaintiff to not call Ms. Krug back because *he* would be taking care of Ms. Krug's concerns. *Id.* Later that day, Mr. Wiberg claims he was contacted by a Lydia Diaz, also a BBSI employee, who informed him that Plaintiff had called Ms. Krug back after Mr. Wiberg had instructed her not to and told Ms. Krug that she did not think Ms. Krug's company would be serviced in the way Ms. Krug hoped for. *Id.* at 41-42. Plaintiff disputes Mr. Wiberg's account by asserting that she "never disregarded" Mr. Wiberg's directive, but does admit to calling Ms. Krug back after speaking with Mr. Wiberg to "reassure her that Wiberg would be in contact and would be the one responsible for handling her account." (Ct. Rec. 35 ¶ 14.)

As a result of the above-described incident with Ms. Krug, Plaintiff's employment was suspended by Mr. Wiberg, allegedly at the direction of Mr. Krug, in the morning of September 20, 2004. Later that day, Plaintiff claims to have received a message from Connie Johnson, who was the client representative at the Simplot facility in Moses Lake,

---

[5] There is no indication in the record whether Lennis Krug is related to Mr. Krug. However, in Plaintiff's Statement of Disputed and Undisputed Facts Under LR 56(a) and (b), Plaintiff's counsel explains that Ms. Krug is Mr. Krug's ex-wife. (Ct. Rec. 33 ¶ 10.)

ORDER-- *9*

which was one of BBSI's main clients and the primary BBSI contract Plaintiff worked on. *Id.* ¶ 15.    Plaintiff then explains that she returned Ms. Johnson's call "to let her know Wiberg would be handling her concerns as [she] was on suspension." *Id.* During this and all other client conversations, Plaintiff claims not to have said anything negative about BBSI. *Id.* at 16.

Following her conversation with Plaintiff, Ms. Johnson called Mr. Wiberg. (Ct. Rec. 25 ¶ 5.)  During this conversation, BBSI claims Ms. Johnson questioned Mr. Wiberg about the circumstances surrounding Plaintiff's suspension and expressed concerns about the service Ms. Johnson was going to receive from BBSI. *Id.*  After speaking with Ms. Johnson, Mr. Wiberg explains that he called Mr. Krug to inform him of the conversation. *Id.* at ¶ 6.  After speaking with Mr. Wiberg about his conversation with Ms. Johnson, Mr. Krug allegedly decided to discharge Plaintiff's employment with BBSI. (Ct. Rec. 26 ¶ 7.)  Mr. Krug explains that his decision was "triggered by the fact that Gonzales had disclosed her suspension to Johnson," which in Mr. Krug's view, "caused Simplot to be unnecessarily concerned about whether it would receive good service and to question BBSI's management." *Id.*  Accordingly, Mr. Krug claims to have directed Mr. Wiberg to notify Plaintiff of her termination by letter. *Id.*  Thereafter, in a letter dated September 29, 2004, Mr. Wiberg informed Plaintiff that her employment with BBSI had been terminated as of September 22, 2004. (Ct. Rec. 48 Ex. 13.)  Mr. Wiberg later stated in a letter to Plaintiff's counsel that Plaintiff had been discharged "for violating her Employment Agreement during the period of suspension." *Id.* at 14.

ORDER-- *10*

After Plaintiff's employment was terminated, BBSI claims Ms. Diaz, Juan Delarosa, and Mr. Wiberg collectively shared Plaintiff's main job functions for the remainder of 2004, until January 2005, when Ms. Diaz took over Plaintiff's former job functions, which primarily related to BBSI's Moses Lake Simplot contract.[6] (Ct. Rec. 36 at 70-71.)  According to BBSI, from September 2004 to December 2004, Mr. Delarosa and Ms. Diaz both performed about thirty percent of Plaintiff's former duties, with Mr. Wiberg taking up the remaining forty percent of the duties. *Id.* at 71.  During this period, Mr. Delarosa and Ms. Diaz were both paid on an hourly rate. *Id.*  In January 2005, Plaintiff's former Moses Lake Simplot duties, which constituted a bulk of Plaintiff's responsibilities, were wholly transferred to Ms. Diaz. *Id.*  Thereafter, in June 2005, Plaintiff's former Moses Lake Simplot duties were transferred from Ms. Diaz to Mr. Morrison. *Id.* at 79.

**F. Mr. Krug's Statements to the Employment Security Department**

Following her termination, Plaintiff sought unemployment compensation benefits from the Washington State Employment Security Department ("ESD"). (*See generally* Ct. Rec. 48 Ex. 15.)  In the ESD's "Notice to Employer - Claimant's Separation Statement" form, BBSI was asked to describe the reasons why Plaintiff was no longer employed by BBSI. *Id.*  Specifically, BBSI was asked: "What reason did [Plaintiff] give for quitting on the last day?" *Id.*  In response to this question, Mr. Krug answered: "Walked off the job." *Id.*  Later in the document,

---

[6] In an interrogatory response, BBSI indicates that Mr. Wiberg and Ms. Earley had primarily taken over Plaintiff's position.  This response in contradicted by Mr. Wiberg's later explanation that Ms. Diaz, Mr. Delarosa, and Mr. Wiberg assumed Plaintiff's former responsibilities.

ORDER-- *11*

when BBSI was asked: "What was the final incident that caused the claimant to be discharged?", Mr. Krug responded: "Voluntary Quit. Attempt to influence customers." *Id.* In addition, Mr. Krug noted that he believed Plaintiff's "misconduct" was deliberate, malicious, and could have caused considerable harm to BBSI. *Id.* Finally, when asked whether Plaintiff had violated any company rule, Mr. Krug broadly stated that Plaintiff had violated her Employment Agreement. *Id.* The ESD ultimately determined Plaintiff had not been terminated for reasons constituting "misconduct" as the term is used in Washington's Unemployment Security Act and that Plaintiff was entitled to unemployment compensation benefits.

## II. Motions for Summary Judgment

**A. Summary Judgment Standard**

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under

ORDER-- *12*

the governing law." *Id.*   There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248.  This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

**B. Analysis**

BBSI requests summary judgment on Plaintiff's three causes of action: (1) gender discrimination in violation of the WLAD; (2) breach of a promise of specific treatment in specific situations; and (3) violations of the Minimum Wage Act's ("MWA's") overtime compensation requirements.  BBSI also moves for summary judgment on Plaintiff's collateral estoppel theory.  Plaintiff cross-moves for summary judgment on her MWA overtime claim.

///

ORDER-- *13*

**1. Collateral Estoppel**

In her Complaint, Plaintiff alleges that because the administrative law judge presiding over her state unemployment compensation hearing found no showing of misconduct by Plaintiff in connection with her termination, BBSI is now collaterally estopped from arguing Plaintiff was discharged due to misconduct. (Ct. Rec. 2 ¶ 7.1-7.4.) BBSI refutes this assertion in its Motion for Summary Judgment.[7]

Under Washington law,

[a]ny finding, determination, conclusion, declaration, or final order made . . . by an . . . administrative law judge . . . for the purposes of Title 50 RCW, shall not be conclusive, nor binding, nor admissible as evidence in any separate action outside the scope of Title 50 RCW between an individual and the individual's present or prior employer before an arbitrator, court, or judge of this state or the United States, regardless of whether the prior action was between the same or related parties or involved the same facts . . . .

R.C.W. § 50.32.097. Accordingly, because the administrative law judge's conclusion was made for the purposes of determining Plaintiff's eligibility for benefits under Title 50 of the Revised Code of Washington, his conclusion is neither admissible as evidence in this action nor binding on this Court. *Id.; see also Christensen v. Grant County Hosp. Dist. No. 1*, 153 Wash. 2d 299, 315-16 (2004). For this reason, the Court finds Plaintiff's assertion that the doctrine of collateral estoppel precludes BBSI from arguing Plaintiff was discharged due to misconduct does not apply and grants BBSI's Motion for Summary Judgment to this extent.

///

---

[7] Plaintiff offers no opposition to the collateral estoppel-based arguments made by BBSI. (*See* Ct. Rec. 47 (Collateral estoppel issue not addressed by Plaintiff in her response.).)

ORDER-- *14*

**2. Discrimination Claim**

The Washington Law Against Discrimination ("WLAD") prohibits employers from discharging employees on the basis of their gender. R.C.W. § 49.60.180(2). When a plaintiff relies on direct evidence of discrimination to prove his or her WLAD claim, he or she need only prove that

> discriminatory animus was a substantial factor in the decision at issue, after which the burden of persuasion shifts to the employer, who must prove that it would have taken the same action regardless of discriminatory animus.

*Griffith v. Schnitzer Steel Indus., Inc.*, 128 Wash. App. 438, 447 n.4 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-53 (1989) & *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wash. 2d 302, 309-10 (1995)). However, when a plaintiff attempts to prove a WLAD claim through the exclusive use of circumstantial evidence, the burden shifting analysis established in *McDonnell Douglas* is utilized. *Kastanis v. Educ. Employees Credit Union, 122 Wash. 2d 483, 490 (1993)* (The Washington Supreme Court had previously "adopted the standard articulated by *McDonnell Douglas* in discrimination cases that arise out of [the WLAD] . . . ."); *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wash. 2d 355, 364 (1988) (adopting the *McDonnell Douglas* burden-shifting analysis as described in *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)).

Under the *McDonnell Douglas* burden shifting framework,

> the plaintiff has the initial burden of proving a prima facie case. Once the plaintiff establishes a prima facie case, an inference of discrimination arises. In order to rebut this inference, the defendant must present evidence that the plaintiff was terminated for a legitimate reason. The plaintiff must then show that the proffered reason is a pretext for discrimination. The plaintiff has the final burden

ORDER-- *15*

of persuading the trier of fact that discrimination was a
substantial factor in the termination decision. If a plaintiff
cannot establish specific and material facts to support each
element of the prima facie case, the defendant is entitled to
judgment as a matter of law.  If a plaintiff cannot present
evidence that the defendant's reasons are untrue or mere
pretext, summary judgment is proper. Even if both parties meet
their requisite burdens, summary judgment is still proper if
no rational trier of fact could conclude the action was
discriminatory.

*Domingo v. Boeing Employees' Credit Union*, 124 Wash. App. 71, 77-78

(2004) (internal citations omitted); *Kastanis*, 122 Wash. 2d at 490;

*Grimwood*, 110 Wash. 2d at 363-64; *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 801-02 (1973).

The *McDonnell Douglas* burden shifting analysis

addresses two problems that exist in most employment
discrimination cases: (1) direct evidence of discrimination is
likely to be unavailable, and (2) the employer has the best
access to the reasons that prompted him to fire, reject,
discipline or refuse to promote the complainant.

*Loeb,* 600 F.2d at 1014 (analysis approved of by the Washington Supreme

Court in *Grimwood*, 110 Wash. 2d at 363).

### a. Plaintiff's *Prima Facie* Case of Discrimination

In its moving papers, BBSI urges the Court to dismiss Plaintiff's

WLAD claim based on a finding that Plaintiff is unable to establish a

*prima facie* case of discrimination under the *McDonnell Douglas* burden-

shifting analysis.  In support of this theory, BBSI cites to the *prima*

*facie* standard set forth in *Domingo*:

To establish a prima facie sex discrimination case, a
plaintiff must show that she: (1) is a member of a protected
class; (2) was discharged; (3) was doing satisfactory work;
and (4) was replaced by a person of the opposite sex or
otherwise outside the protected group.

124 Wash. App. at 80 (citing *Kuest v. Regent Assisted Living, Inc.*, 111

Wash. App. 36, 43-44 (2002), *review denied*, 149 Wash. 2d 1023 (2003)).

ORDER-- *16*

According to BBSI, because the bulk of Plaintiff's former duties, i.e. the Moses Lake Simplot contract, were transferred to Ms. Diaz, a woman, in January 2005, Plaintiff is unable to establish the fourth element of a *prima facie* case under *Domingo*, which requires a showing that Plaintiff was replaced by a man.    Plaintiff counters by arguing that the fourth element under *Domingo* has been met because Mr. Morrison, a man, ultimately assumed her duties in June 2005.    The parties respective arguments on this point are misplaced because the *prima facie* standard outlined in *Domingo* is an inaccurate restatement of the *prima facie* standard established in *McDonnell Douglas* and adopted by the Washington Supreme Court in *Grimwood*. *See generally Kastanis*, 122 Wash. 2d at 490 ("This court has adopted the standard articulated by *McDonnell Douglas* in discrimination cases that arise out of RCW 49.60.180 . . . ." *Grimwood*, 110 Wash. at 364.).

Before explaining why the *prima facie* standard outlined in *Domingo* is a inaccurate restatement of the *prima facie* standard adopted in *Grimwood*, the Court notes that although the Washington Supreme Court has indicated it is not bound by federal opinions interpretating federal discrimination statutes comparable to the WLAD, federal opinions serve as a "source of guidance" for courts interpreting and applying the WLAD. *See e.g. Grimwood*, 110 Wash. 2d 361-62 (considering federal cases interpreting the federal Age Discrimination in Employment Act when addressing age discrimination under the WLAD); *Marquis v. City of Spokane*, 130 Wash.2d 97, 113 (1996) ("The [WLAD] does not provide criteria for establishing a claim of sex discrimination in the making and performance of contracts for personal services and, in this regard,

ORDER-- *17*

it is helpful to consider interpretation of analogous federal law."). For this reason and because the Washington State Supreme Court expressly adopted the federal *McDonnell Douglas* burden-shifting analysis for WLAD claims, the Court now looks to relevant federal opinions for guidance on the WLAD issues now before the Court, for which no Washington court has previously provided reasoned guidance.

In *McDonnell Douglas*, a racial discrimination case based on an alleged *wrongful failure to hire*, the Supreme Court explained that a *prima facie* case is established if a plaintiff shows

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802. Although the *McDonnell Douglas* burden-shifting analysis does not require direct proof of discrimination, it does require the plaintiff, through the establishment of the above-stated *prima facie* case, to demonstrate

> that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought.

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977). "Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.*[8]

---

[8] As recognized by Magistrate Judge Chen in *Bowden v. Potter*, Ninth Circuit case law is in conflict on the issue of whether the *McDonnell Douglas prima facie* standard in discrimination discharge cases requires a showing by the plaintiff that he or she was replaced by someone outside their protected class. 308 F. Supp. 2d 1108, 1113

ORDER-- *18*

When the *prima facie* standard outlined in *McDonnell Douglas* is applied to a wrongful discharge case, the critical elements . . . must be modified to produce an analogous inference." *Loeb*, 600 F.3d at 1013. In this effort, the First Circuit has explained that the *prima facie* elements in a discriminatory discharge case are as follows:

> [The plaintiff] was in the protected [ ] group, that he was performing his job at a level that met his employer's legitimate expectations, that he nevertheless was fired, and that [the employer] sought someone to perform the same work after [the plaintiff] left.

*Loeb*, 600 F.2d at 1014. Similarly, the Tenth Circuit has set forth the following *prima facie* elements for discriminatory discharge cases:

> (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge.

*Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999) (citations omitted).

The First and Tenth Circuit *prima facie* standards do not include "replacement" elements as the *prima facie* standard in *Domingo*, 124 Wash.

---

n.4 (comparing *Chuang v. Univ. of Cal. Davis, Board of Trustees*, 225 F.3d 1115 (9th Cir. 2000) (Fourth *prima facie* element requires showing that "similarly situated individuals outside his protected class were treatment more favorably.") with *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, (9th Cir. 1998) (Fourth *prima facie* element requires showing that other employees with *qualifications* similar to her own were treated more favorably.), *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 n.5 (9th Cir. 2003) (characterizing the fourth *prima facie* element in same way as characterized in *Godwin*), *Pejic v. Hughes*, 840 F.2d 667 (9th Cir. 1988) (Fourth *prima facie* element requires showing that "employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills . . . ."), and *Sengupta v. Morrison-Knudsen Co.*, Inc., 804 F.2d 1072, 1075 (9th Cir. 1986) (characterizing the fourth *prima facie* element in same way as characterized in *Sengupta*)). In light of this conflict, the Court looks to other others Circuits, which have expressly addressed this issue, for guidance.

ORDER-- *19*

App. at 80, does.  However, they are more consistent with the *prima facie* standard outlined in *McDonnell Douglas* and satisfy the goal of initially demonstrating a plaintiff's discharge did not result from the two most common and legitimate termination reasons: unsatisfactory performance and position elimination. *See Loeb*, 600 F.3d at 1013.  The *prima facie* standards outlined by the First and Tenth Circuits are also consistent with United States Supreme Court's ruling in *O'Conner v. Consolidated Coin Caterers Corp.*, an age discrimination case, in which a unanimous Court stated:

> As the very name "prima facie case" suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a "legally mandatory, rebuttable presumption," [*Burdine*, 450 U.S. at 254 n.7]. The element of replacement by someone under 40 fails this requirement . . . . The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age.

517 U.S. 308, 312 (1996).

The First and Tenth Circuit's *prima facie* standards are also consistent with several other Circuits' conclusions that plaintiffs are not *per se* barred from establishing a *prima facie* case of discharge discrimination simply because they are unable to prove their positions were filled by someone outside their protected class.[9]

---

[9] *See Meiri v. Dacon*, 759 F.2d 989, 995-96 (2d Cir. 1985) ("[Requiring] an employee, in making out a prima facie case, to demonstrate that she was replaced by a person outside the protected class . . . is inappropriate and at odds with the policies underlying Title VII."); *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 n.7 (5th Cir. 1997) ("While the fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.'") (citation omitted); *Jackson v. Richards Med. Co.*, 961 F.2d 575, 587 n.12 (6th Cir. 1992) ("We wish to make clear . . . that the fact that an employer replaces a Title VII plaintiff with a person from within the

ORDER-- *20*

Because the burden-shifting analysis established in *McDonnell Douglas* and its federal progeny does not require a plaintiff to demonstrate he or she was replaced by someone outside his or her protected class and the *McDonnell Douglas* analysis was expressly recognized as the applicable standard for analyzing WLAD cases, *see Kastanis*, 122 Wash. 2d at 490, the Court concludes that plaintiffs pursuing WLAD discharge claims need not satisfy the "replacement" element outlined in *Domingo*. Instead, a plaintiff seeking relief in a WLAD discharge case need only produce sufficient evidence to establish the *prima facie* elements respectively outlined by the First and Tenth Circuits in *Loeb* and *Perry*: (1) the plaintiff is a member of a protected class; (2) the plaintiff was doing satisfactory work; (3) the plaintiff was discharged; and *(4) the plaintiff's position was not eliminated after her discharge.*

The Court recognizes this ruling is not only counter to language

---

same protected class as the plaintiff is not, by itself, sufficient grounds for dismissing a Title VII claim."); *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) ("That one's replacement is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition."); *Walker v. St. Anthony's Med. Ctr.*, 881 F.2d 554, 558 (8th Cir. 1989) ( "[T]he sex of [plaintiff's] replacement, although a relevant consideration, is not necessarily a determinative factor in answer to either the initial inquiry of whether she established a *prima facie* case or the ultimate inquiry of whether she was the victim of discrimination."); *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534 (11th Cir. 1984) (holding that a district court misstated the law when it concluded that "there can be no racial discrimination against a black person who is not selected for a job when the person who is selected for the job is black" (internal quotation omitted)); *cf. Brown v. McLean*, 159 F.3d 898, 905 (4th Cir. 1998) ("In order to make out a *prima facie* case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class."); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

ORDER-- *21*

found in *Domingo*, but also counter to express language found in the Washington Supreme Court's opinion in *Kastanis*, in which that court stated:

> This court has adopted the standard articulated by *McDonnell Douglas* in discrimination cases that arise out of RCW 49.60.180 . . . . *Grimwood v. Univ. of Puget Sound*, 110 Wash. 2d 355, 364, 753 P.2d 517 (1988) . . . .
>
> Under *McDonnell Douglas*, a plaintiff must first make out a prima facie discrimination case by showing that he or she: (1) was within the protected group; (2) was discharged; (3) was replaced by a person outside the protected group; and (4) was qualified to do the job. See McDonnell Douglas, at 802, 93 S. Ct. at 1824.

*Id.* Because the *Kastanis* opinion addressed jury instruction issues unrelated to what the proper elements of a *prima facie* discharge case are, the Washington Supreme Court's *prima facie* element recitation is merely *dicta* and not binding on this Court.  Furthermore, as it is evident that *Kastanis* held the *McDonnell Douglas* standard is to be used when analyzing WLAD cases, the Court concludes it is bound by the analysis set forth in *McDonnell Douglas*, which does not include a "replacement" *prima facie* element.

This conclusion is consistent with the Washington Supreme Court's *Grimwood* opinion, which approved of the First Circuit's analysis in *Loeb* and recognized that the court in *Loeb* did not include a replacement requirement in its analysis. *Grimwood*, 110 Wash. 2d at 363 ("In *Loeb*, the court also points out that the element of replacement by a younger person or a person outside the protected age group is not absolute; rather the proof required is that the employer 'sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills.'").

ORDER-- *22*

In addition, this Court has found no Washington appellate opinion that has addressed the rationale for including a replacement element in the *prima facie* standard.   Instead, all post-*Grimwood* Washington appellate opinions located and reviewed by this Court that recite *prima facie* standards that include replacement elements, only do so in the course of addressing unrelated burden-shifting issues.[10]

Thus, because research reveals that no Washington court has announced a rationale for including the replacement element recited in *Domingo* and *Kastanis*, the Court believes it is better to follow the *prima facie* analysis outlined by the First Circuit in *Loeb*, which was approved of by the Washington Supreme Court in *Grimwood*, 110 Wash. 2d at 363-64, and is consistent with the rationale for the test, which was articulated by the United States Supreme Court in *McDonnell Douglas*, and the standard recited in several Ninth Circuit opinions, including *Godwin*, 150 F.3d at 1217, *Vasquez*, 349 F.3d at 640 n.5, *Pejic v. Hughes*, 840 F.2d at 667, and *Sengupta*, Inc., 804 F.2d at 1075.

Now that the Court has identified the proper *prima facie* standard to be employed in WLAD discharge cases, it turns its attention to

---

[10] *See e.g.  Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172 (2001); *Griffith v. Schnitzer Steel Indus., Inc.*, 128 Wash. App. 438 (2005); *Douchette v. Bethel Sch. Dist. No. 403*, 117 Wash. 2d 805 (1991); *Bulaich v. AT&T Information Sys.*, 113 Wash. 2d 254 (1989); *Becker v. Cashman*, 128 Wash. App. 79 (2005); *Kirby v. City of Tacoma*, 124 Wash. App. 454 (2004); *Roeber v. Dowty Aerospace Yakima*, 116 Wash. App. 127 (2003); *Kuest v. Regent Assisted Living, Inc.*, 111 Wash. App. 36 (2002); *Milligan v. Thompson*, 110 Wash. App. 628 (2002); *Haubry v. Snow*, 106 Wash. App. 666 (2001); *Rhodes v. URM Stores, Inc.*, 95 Wash. App. 794 (1999); *Ware v. Mut Materials Co.*, 93 Wash. App. 639 (1999); *Chen v. State*, 86 Wash. App. 183 (1997); *Cluff v. CMX Corp. Inc.*, 84 Wash. App. 634 (1997); *MacDonald v. Korum Ford*, 80 Wash. App. 877 (1996); *Schonauer v. DCR Entertainment, Inc.*, 79 Wash.App. 808 (1995); *Hatfield v. Columbia Fed. Sav. Bank*, 68 Wash. App. 817 (1993); *Jones v. Kitsap County Sanitary Landfill, Inc.*, 60 Wash. App. 369 (1991).

ORDER-- *23*

determining whether Plaintiff carried her initial burden of production under the *prima facie* phase of the *McDonnell Douglas* burden-shifting analysis, which requires Plaintiff to produce evidence that (1) she was a member of a protected class; (2) she was doing satisfactory work; (3) she was discharged; and (4) her position was not eliminated after her discharge.  Under this standard, the Court finds Plaintiff has met her *prima facie* burden.  First, Plaintiff is a woman, which is a protected class under WLAD.  Second, Plaintiff has produced evidence that she was doing satisfactory work, e.g. given a raise in June 2004, complimented and encouraged to remain with BBSI by Mr. Wiberg in an August 25, 2004, letter, denies violating Mr. Wiberg's alleged directive to not contact Ms. Krug, which was the basis for her September 2004 suspension, and denies making negative comments about BBSI to Ms. Krug or Ms. Johnson, which BBSI claims led to its decision to terminate her employment.  Third, Plaintiff was discharged.  Finally, Plaintiff's position was not eliminated after she was discharged.  Instead, Mr. Morrison was assigned Plaintiff's Othello Simplot responsibilities after being with BBSI for one week and Plaintiff's Moses Lake Simplot duties were temporarily covered by Mr. Wiberg, Ms. Diaz, and Mr. Delarosa, and eventually transferred to Ms. Diaz and then again to Mr. Morrison.  This transfer of duties demonstrates that Plaintiff's position was not eliminated and that BBSI continued needing someone to perform the same work formerly performed by Plaintiff.

Because Plaintiff established her *prima facie* case, an inference of discrimination has arisen and the burden of production shifts to BBSI to produce evidence of a nondiscriminatory reason for Plaintiff's

ORDER-- *24*

termination. *Grimwood*, 110 Wash. 2d at 363-64.

### b. BBSI's Nondiscriminatory Explanation

BBSI explains that Plaintiff's gender played no role in its decision to discharge her employment. Instead, according to BBSI, Plaintiff's employment was terminated because she caused a BBSI customer to be unnecessarily concerned about whether it would receive good service and to question BBSI's management.

In addition, BBSI argues it is entitled to a "strong inference" of nondiscrimination under *Hill v. BCTI Income Fund-I*, 144 Wash. 2d 172 (2001), because she was allegedly hired and fired by the same actor, to wit, Mr. Krug. In *Hill*, the Washington Supreme Court stated:

> When someone is both hired and fired by the same decisionmakers within a relatively short period of time, there is a strong inference that he or she was not discharged because of any attribute the decisionmakers were aware of at the time of hiring.

144 Wash. 2d 172, 189 (2001) (internal citations omitted). For this reason, an employee faced with the same actor inference described in *Hill*, "cannot rely on simply presenting a prima facie case of discrimination and rebutting the justifications proffered for his termination." *Griffith v. Schnitzer Steel Indus., Inc.*, 128 Wash. App. 438, 454 (2005) (citing *Hill*, 144 Wash. 2d at 188-89). Instead,

> to prevail under such circumstances, the evidence must answer an obvious question: if the employer is opposed to employing persons with a certain attribute, why would the employer have hired such a person in the first place?

*Hill*, 144 Wash. 2d 189-90.

BBSI's nondiscriminatory explanation and same actor inference assertion are supported by sworn statements made by Mr. Wiberg and Mr. Krug. (Ct. Recs. 25 & 26.) Accordingly, the inference of discrimination

ORDER-- *25*

disappears and the burden of producing evidence that BBSI's
nondiscriminatory explanation is pretext for a discriminatory motive and
rebutting the same actor inference shifts to Plaintiff. *Grimwood*, 110
Wash. 2d at 363-64; *Hill*, 144 Wash. 2d 189-90.

### c. Plaintiff's Evidence of Pretext

The Court finds Plaintiff submitted sufficient evidence that BBSI's
explanation for terminating her employment was pretext for
discriminatory motives to (1) rebut the same actor inference and (2)
avoid summary judgment under the *McDonnell Douglas* burden-shifting
analysis. Important to these findings is the following time line of
events leading up to and immediately after Plaintiff's termination:

In December 2003, Plaintiff was essentially promoted from her pre-
BBSI position of receptionist to customer service representative by Mr.
Krug after SRML, Plaintiff's former employer, was acquired by BBSI. (Ct.
Recs. 26 ¶ 2 & 27 Ex. 11.) When hired by BBSI, Plaintiff was given
greater responsibilities and a $22,100.00 salary. *Id.* During her first
eight months in this position, Plaintiff appears to have excelled, which
is evidenced by the fact that (1) Plaintiff was given a substantial pay
raise after her first six months with BBSI (Ct. Rec. 26 ¶ 4 (Plaintiff
salary increased from $22,100.00 to $26,364.00.)) and (2) no evidence of
under-performance or misconduct by Plaintiff prior to September 2004 has
been presented by the parties.

Then, in August 2004, after eight months with BBSI and only two
months after Mr. Wiberg was promoted from "in-house temp" to BBSI's
Moses Lake Location Manager and Plaintiff's direct supervisor,
Plaintiff's employment problems began after she complained to Mr. Wiberg

ORDER-- *26*

about Ms. Earley's alleged harassment. (Ct. Rec. 25 ¶ 3.) This complaint resulted in Mr. Wiberg issuing written reprimands to both Plaintiff and Ms. Earley. *Id.* at Ex. 1. However, for unexplained reasons, Plaintiff's written reprimand was prepared by Mr. Wiberg on August 17, 2006, and indicated Plaintiff would be reevaluated two weeks later, while Ms. Earley's written reprimand was not prepared until August 24, 2006, and did not include any follow-up corrective action. *Id.* The delayed preparation of Ms. Earley's reprimand and disparate corrective action is particularly suspicious in light of the circumstantial evidence offered by Ms. Garay that Mr. Wiberg and Ms. Earley may have been romantically involved. (*See* Ct. Rec. 64 ¶ 13.)

Then, on September 3, 2004, in his written reevaluation of Plaintiff, Mr. Wiberg noted that he had "witnessed a drastic change and improvement" on Plaintiff's behalf and that he did not believe any further evaluation would be needed. (Ct. Rec. 56 Ex. 6.) However, only two weeks later, on September 20, 2004, Plaintiff was suspended for contacting a customer representative (Ms. Krug) after Mr. Wiberg allegedly told Plaintiff not to - a point disputed by Plaintiff. (Ct. Rec. 35 ¶¶ 14 & 15.) Plaintiff's suspension was then followed up by a September 29, 2004, letter stating that Plaintiff had been discharged on September 22, 2004, for unexplained reasons. (Ct. Rec. 48 Ex. 13.) Similarly, a letter written to Plaintiff's attorney on December 7, 2004, only vaguely explained that Plaintiff's employment had been terminated because Plaintiff had "violat[ed] her Employment Agreement during the period of suspension." *Id.* at Ex. 14.

Of further importance to the time line of events related to

ORDER-- *27*

Plaintiff's termination is (1) Mr. Wiberg's recruitment and hiring of Mr. Morrison, which was completed only one week prior to Plaintiff's termination (Ct. Rec. 36 at 47 & 77), (2) Mr. Morrison's immediate assignment to receive training from Plaintiff with her Othello Simplot duties, *id.* at 78-79, (3) Mr. Morrison taking over of the Othello Simplot contract after Plaintiff's employment was terminated and nine months later assuming the bulk of Plaintiff's former responsibilities when the Moses Lake Simplot contract were transferred to him from Ms. Diaz, *id.*, and (4) conflicting responses provided by Mr. Krug on the ESD Notice to Employer - Claimant's Separation Statement (Ct. Rec. 48 Ex. 15), which was likely filled out only weeks, if not days, after Plaintiff was discharged.

This series of events, in which Plaintiff's troubles at BBSI did not begin until Mr. Wiberg became her supervisor and she complained to him about Ms. Earley, support Plaintiff's theory that she was not terminated for the reason now given by BBSI. Furthermore, when the events are considered in connection with the sexist statements allegedly made by Mr. Wiberg (Ct. Recs. 35 ¶ 19; 36 Ex. 1 at 83-88; 36 Ex. 3 at 18; 64 ¶ 11) and the fact that Mr. Morrison, a man, who was hired only one week before Plaintiff was discharged, immediately took over Plaintiff's Othello Simplot duties and eventually took over the bulk of her responsibilities when Plaintiff's Moses Lake Simplot responsibilities were transferred to him, the Court believes a reasonable juror could find sex discrimination was a substantial factor in Plaintiff's termination.

In addition, the Court notes the record contains no sworn

ORDER-- *28*

statements from Ms. Krug and Ms. Johnson, which would confirm their claims that Plaintiff spoke negatively about BBSI on the day she was suspended.  A reasonable inference from the absence of such statements supports Plaintiff's claim that she merely contacted the two customer representatives to inform them that she would not be handling their concerns and that she did not speak negatively about BBSI or its management team during the conversations Plaintiff was allegedly terminated for having.  Moreover, the Court finds Plaintiff's termination letter's failure to include any reason for her discharge, as well as the vague explanation for the termination in BBSI's letter to Plaintiff's counsel, and the inexplicable and confusing responses provided by BBSI on the ESD "Notice to Employer - Claimant's Separation Statement" each support Plaintiff's claim that BBSI's explanation for her termination is pretext.

Furthermore, the same actor inference arising in this case is rebutted but the circumstances under which Plaintiff was hired and later fired.  In December 2003, when Mr. Krug hired Plaintiff, Mr. Wiberg was neither employed by BBSI nor Plaintiff's direct supervisor.  Thus, Mr. Krug's decision was not influenced by Mr. Wiberg or any sex discrimination that Mr. Wiberg may have engaged in.  This circumstance changed in June 2004, when Mr. Wiberg, who had been hired by BBSI in April 2004, was promoted to Location Manager for BBSI's Moses Lake office, and became Plaintiff's direct supervisor and the liaison between Plaintiff and Mr. Krug.  From this point on, everything Mr. Krug knew about Plaintiff's job performance, he learned from Mr. Wiberg.  Thus, Mr. Krug's perceptions of Plaintiff were likely influenced and directed

ORDER-- *29*

by the information and accounts provided by Mr. Wiberg, whom Plaintiff claims held discriminatory attitudes about women, as evidenced by the sexist comments Mr. Wiberg is alleged to have made on several occasions.

Therefore, because all information Mr. Krug knew about Plaintiff's conversations with Ms. Krug and Ms. Johnson, the incidents that led to Plaintiff's suspension and termination, came from Mr. Wiberg, who was in a strong position to influence Mr. Krug's decisions and recommend a discriminatory course of action, the Court finds Plaintiff has sufficiently explained why her termination by Mr. Krug could have been the result of discrimination even though Mr. Krug had hired her only nine months earlier.  In sum, the circumstances had changed between December 2003 and September 2004.  Mr. Wiberg, the purported discriminator, was not present during the earlier decision.  Thus, any discriminatory motives Mr. Wiberg held as Plaintiff's supervisor and influence he carried as the Location Manager were not present.  This evidence answers the question posed in *Hill* and precludes summary judgment based on the same actor inference. *See Hill*, 144 Wash. 2d at 189-90.

Accordingly, because (1) Plaintiff has met her *McDonnell Douglas* burden of producing sufficient evidence to demonstrate a triable issue of fact exists regarding whether BBSI's reasons for terminating her employment are untrue or mere pretext for discriminatory motives and (2) a reasonable jury could find in Plaintiff's favor on her WLAD discrimination claim in spite of the same actor inference arising from Mr. Krug's alleged hiring and firing role, the Court denies this portion of BBSI's request for summary judgment.  A jury is required to weigh the

ORDER-- *30*

anticipated witnesses' credibility and to determine whether Plaintiff's employment was terminated for the reasons now proffered by BBSI or for unlawful reasons as asserted by Plaintiff.

### 3. Breach of Promises of Specific Treatment Claim

"Generally, an employment contract, indefinite as to duration, is terminable at will by either the employee or employer." *Thompson v. St. Regis Paper Co.*, 102 Wash. 2d 219, 223 (1984) (citations omitted). However,

> if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.

*Id.* at 230 (emphasis in original). Under this exception, an employer may be found liable for a statement contained in an employee handbook if the employee is able to prove that (1) the statement amounts to a promise of specific treatment in specific situations, (2) the employee justifiably relied on the promise, and (3) the promise was breached. *Bulman v. Safeway, Inc.*, 144 Wash. 2d 335, 340-41 (2001).

Plaintiff alleges BBSI broke certain promises contained in its Employee Handbook and that the alleged misconduct should result in liability under the "specific treatment in specific situations" cause of action established in *Thompson.* Specifically, Plaintiff claims that anti-harassment and retaliation policies contained in the Employee Handbook's constitute promises of specific treatment in specific situations and that when BBSI allegedly permitted Plaintiff's termination for reporting Ms. Earley's alleged harassment to Mr. Wiberg, it violated its promise that she would not be retaliated against for

ORDER-- *31*

bringing harassment concerns to the attention of her supervisor.

In *Francom v. Costco Wholesale Corp.*, 98 Wash. App. 845 (2000), the plaintiffs claimed Costco breached an obligation it owed them under the anti-harassment policy contained in Costco's employee handbook when Costco permitted a co-worker to harass the plaintiffs. *Id.* at 866. The Costco anti-harassment stated:

> Costco prohibits sexual harassment of its employees by other employees or outside parties. Sexual harassment negatively affects morale, motivation, and job performance. It is inappropriate, offensive, and illegal and will not be tolerated.

*Id.* After recognizing the specific treatment in specific situations cause of action discussed in *Thompson*, the state appellate court stated that

> Costco's employment handbook was a general policy statement condemning sexual harassment. In contractual terms, it obligated Costco only to comply with the law, and thus was an illusory promise unsupported by consideration.

*Id.* at 867 (citation omitted).

Here, as was found in *Francom*, the Court finds the anti-harassment and retaliation policies contained in BBSI's Employee Handbook were not enforceable promises, but merely policy statements that only obligated BBSI to comply with the law. Supporting this conclusion is the Employee Handbook's clear notice in the Acknowledgment of Receipt that the Employee Handbook was to "serve as a guide" and that "it is not the final word in all cases." (Ct. Rec. 27 Ex. 16.) In addition, the Employee Handbook's anti-harassment and retaliation policies merely recite the legal prohibitions placed on workplace harassment and retaliation by various state and federal causes of action, e.g. Title VII, wrongful discharge in violation of public policies, etc.

ORDER-- *32*

Furthermore, the Court also finds Plaintiff failed to present any evidence to support a finding she relied on the anti-discrimination and retaliation policies when she decided to complain to Mr. Wiberg about Ms. Earley.  Although Plaintiff's counsel claims Plaintiff relied on the policies and points the Court to excerpts from Plaintiff's deposition testimony in support of this claim (Ct. Rec. 47 at 11 n.24), this assertion is unsupported since the deposition excerpts cited to do not discuss the harassment or retaliation policies at issue.  Thus, because Plaintiff failed to establish a *prima facie* case by presenting evidence of her reliance on the policies, BBSI is entitled to summary judgment on this separate ground as well.

### 4. Overtime Claim

Under Washington's Minimum Wage Act ("MWA"), employers are typically required to pay their employees time and one-half for work exceeding forty hours per work-week. R.C.W. § 49.46.130(1).  However, "[a]ny individual employed in a bona fide executive [or] administrative . . . capacity" is exempt from the above-stated overtime compensation rule. *Id.*; R.C.W. § 49.46.010(5)(c).  Employers bear the burden of proving exempt status under the bona fide executive and administrative capacity exceptions. *Drinkwitz v. Alliant Techsys., Inc.*, 140 Wash. 2d 291, 301 (2000) (citing *Banks v. City of North Little Rock*, 708 F. Supp. 1023, 1024 (E.D. Ark. 1988) (citing *Knecht v. City of Redwood City*, 683 F. Supp. 1307, 1310 (N.D. Cal. 1987))).  In addition, because the MWA is a remedial statute, exemptions thereunder "are narrowly construed and applied only to situations which are plainly and unmistakably consistent with the terms and spirit of the legislation." *Id.* (citing *Knecht*, 683

ORDER-- *33*

F. Supp. at 1310).

BBSI argues Plaintiff was not entitled to overtime compensation because she was employed in both an administrative and executive capacity. Plaintiff disagrees, claiming her duties fell outside the administrative and executive capacity exceptions and that the MWA overtime compensation requirement applied to her when she was working for BBSI. Both parties seek summary judgment on this issue.

### a. Use of Federal FLSA Standards

The Washington Supreme Court has recognized that because the MWA "is based upon the Fair Labor Standards Act ("FLSA"), federal authority under the FLSA often provides helpful guidance." *Drinkwitz*, 140 Wash. 2d at 298; *Webster v. Pub. Sch. Employees of Wash., Inc.*, 247 F.3d 910, 918 (9th Cir. 2001) ("Washington courts generally look to interpretations of the FLSA for guidance in interpreting the MWA where state law is lacking."). "However, the MWA and FLSA are not identical and [Washington state courts] are not bound by such authority." *Drinkwitz*, 140 Wash. 2d at 298 (citations omitted). Despite this disclaimer, the Washington Supreme Court has looked to federal regulations on several occasions to assist its efforts in deriving the meaning of common phrases used in the MWA and the FLSA, which were not defined by the Washington Legislature or the Washington Department of Labor and Industries. *See Webster v. Pub. Sch. Employees of Wash., Inc.*, 148 Wash. 2d 383 (2003); *Drinkwitz*, 140 Wash. 2d at 298.

Thus, it is proper for this Court to look towards federal regulations for assistance in interpreting the meaning of common phrases used in the MWA and FLSA that have not been defined or interpreted by

ORDER-- *34*

Washington state law. *Accord Chelan County Deputy Sherriffs' Ass'n v. County of Chelan*, 109 Wash. 2d 282, 291 (1987) (holding that state courts look to federal case law where state cases are lacking).

      **b. Section 296-128-520's Administrative Capacity Short Test**

    The term "individual employed in a bona fide . . . administrative . . . capacity", as used in R.C.W. § 49.46.010(5)(c), is defined by W.A.C. 296-128-520 as follows:

[A]ny employee:

(1) Whose primary duty consists of the performance of office or non-manual field work directly related to management policies or general business operations of his employer or his employer's customers; or

(2) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

(3) Who customarily and regularly exercises discretion and independent judgment; and

    (a) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in this regulation), or

    (b) Who performs under only general supervision work along specialized or technical lines requiring special training, experience or knowledge, or

    (c) Who executes under only general supervision special assignments and tasks; and

(4) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent of his hours worked in the work week to activities which are not directly and closely related to the performance of the work described in paragraphs (1) through (3) of this section; and

    (a) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week exclusive of board, lodging, or other facilities; or

ORDER-- *35*

> (b) Who, in the case of academic administrative personnel is compensated for his services as required by paragraph (4)(a) of this section, or on a salary basis which is at least equal to the entrance salary for teachers in the school system, educational establishment, or institution by which he is employed: ***Provided, That an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers; which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all of the requirements of this section.***

(emphasis added).

The highlighted proviso at the end of § 296-128-520(4)(b) has been recognized as an independent "short test" for determining whether an employee is an individual employed in a bona fide administrative capacity under the MWA. *Webster*, 247 F.3d at 918 (recognizing parallel MWA "administrative exemption short test" to administrative exemption "short test" set forth in federal FLSA regulations); *Bally v. Ocean Transp. Serv., L.L.C.*, No. 56154-5-I, 2006 WL 1462180, *2 (Wash. App. May 30, 2006) (applying the § 296-128-520(4)(b) proviso to determine whether an employee was an individual employed in a bona fide administrative capacity under R.C.W. § 49.46.010(5)(c)). Thus, if § 296-128-520(4)(b)'s short test is met, a court tasked with determining whether the administrative capacity exception applies need not consider the standard test set forth in above the proviso in § 296-128-520(4)(b). For this reason, the Court begins its inquiry of whether Plaintiff was employed by BBSI in a bona fide administrative capacity by considering whether her position satisfied the requirements set forth in § 296-128-520(4)(b)'s short test.

ORDER-- *36*

"To qualify as an exempt administrative employee under federal and Washington law, an employee must meet both a 'duties test' and a 'salary basis test.'" *Webster*, 148 Wash. 2d at 386 (citations omitted).  Both tests, as they are defined in § 296-128-520(4)(b)'s short test are addressed below.

### i. Salary Basis Test

Under the salary basis test, the employer must prove its employee was "compensated on a salary or fee basis at a rate of not less than $250 per week . . . ." W.A.C. § 296-128-520(4)(b).  It is undisputed by the parties that Plaintiff was at all times paid a salary of at least $425.00 per week while she worked for BBSI. (Ct. Rec. 26 ¶ 4.)  Thus, the requirements of being "compensated on a salary or fee basis" and "at a rate of not less than $250 per week" were met and the Court finds the salary basis test under the § 296-128-520(4)(b) short test has been satisfied.

### ii. Primary Duty Test

Under the duties test, the employer must prove (1) its employee's primary duty consisted of "the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers" and (2) that such work included "work requiring the exercise of discretion and independent judgment . . . ." W.A.C. § 296-128-520(4)(b).  In this case, it is undisputed that Plaintiff's primary duty consisted of the performance of office or non-manual work.  Thus, the only issues remaining with regard to whether the primary duties test was met are (1) whether the office work associated with Plaintiff's primary duty directly related to

ORDER-- *37*

management policies or general business operations of BBSI or BBSI's customers and (2) whether the work associated with Plaintiff's primary duty included work requiring the exercise of discretion and independent judgment. *Id.*

### A. Directly Related to Management Policies or General Business Operations

In its attempt to prove the "directly related to management policies or general business operations of his employer or his employer's customers" requirement of the administrative capacity short test, BBSI takes the position that Plaintiff's primary duty related to the management policies of BBSI's customers. In support of this position, BBSI urges the Court to look to 29 C.F.R. § 541.201 for guidance. The federal regulation begins by stating:

> The phrase "directly related to the management of general business operation" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in retail or service establishment.

29 C.F.R. § 541.201(a). The regulation then goes on to explain that work "directly related to management or general business operations" includes, but is not limited to, work in functional areas such as personnel management, human resources, employee benefits, and labor relations. *Id.* § 541.201(b). Moreover, the regulation explains that the primary duty requirement is met if the work directly related to the management or general business operations of the employer's customers, such as when an employee acts as an adviser or consultant to the employer's clients or customers, e.g. acting as a tax expert or financial consultant. *Id.* § 541.201(c).

ORDER-- *38*

In a separate federal regulation, the United States Department of Labor described when someone holding a human resources position would be exempt under the administrative capacity exception. *Id.* § 541.203(e). The regulation specifically states:

> Human resources managers who formulate, interpret or implement employment policies and management consultants who study the operations of a business and propose changes in organization generally meet the duties requirements for the administrative exemption. However, personnel clerks who "screen" applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption. Such personnel clerks typically will reject all applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do meet the minimum standards is similarly made by the exempt human resources manager or other company officials. Thus, when the interviewing and screening functions are performed by the human resources manager or personnel manager who makes the hiring decision or makes recommendations for hiring from the pool of qualified applicants, such duties constitute exempt work, even though routine, because this work is directly and closely related to the employee's exempt functions.

*Id.*

This regulation was interpreted by the Department of Labor in an opinion letter discussing when a "Staffing Manager" working for a temp-agency is exempt from the FLSA's overtime requirements under the FLSA administrative capacity exception. U.S. Dep't of Labor Op. Letter, 2005 WL 3308616 (October 25, 2005). In its letter, the Department of Labor stated its belief that the employee in question was exempt under 29 C.F.R. 541.203(e) because the duties delegated to her as a Staff Manager were more akin to the human resource manager rather than the personnel clerk described in the regulation. *Id.*

In support of its position that Plaintiff's primary duties fell

ORDER-- *39*

within the administrative capacity exception, BBSI points to the fact that Plaintiff was engaged in personnel management, human resources, and labor relations activities directed at running and servicing the temporary business (employment) needs of BBSI's customers, which is consistent with the type of work highlighted in 29 C.F.R. § 541.201(b) as typically meeting the primary duty requirement of the administrative capacity exception.  In addition, BBSI notes that Plaintiff was not engaged in production or sales, which are typically uncharacteristic of the type of work covered by the FLSA administrative capacity exception. *See id.*

Furthermore, BBSI's position is further supported by the following evidence: (a) Plaintiff's concession during her deposition that her job responsibilities included (1) taking applications from individuals interested in being hired by BBSI and placed in jobs offered by BBSI's customers, (2) conducting background checks on those individuals, (3) conducting basic skills evaluations of those individuals, (4) hiring BBSI's temporary employees, (5) placing BBSI's temporary employees in positions with BBSI's customers, (6) disciplining and terminating BBSI's temporary employees when problems arose with those employees at BBSI's customer's work sites, (7) introducing the temporary workers to their work site "leads", (8) distributing and providing instruction to the temporary workers on their time card procedures, and (9) producing the temporary workers work schedules and locations (Ct. Rec. 27 at 3-7); and (b) Mr. Wiberg's statements that Plaintiff's

> duties included, but were not limited to, reviewing applications, interviewing applicants, performing background checks, performing skills evaluations, checking in employees at the client's facilities, making hiring, disciplining,

ORDER-- *40*

> firing decisions, scheduling, reassigning employees, and tracking employee's performance. Her duties required frequent exercise of discretion and control. Gonzales performed her duties with little supervision because she had the authority to make the decisions necessary to manage the employees for whom she was responsible.

(Ct. Rec. 25 ¶ 4.)

Based on the integral role Plaintiff played in personnel management for BBSI's customers and the fact that she was not simply screening applicants for minimum qualifications, but instead, interviewing, hiring, directing, scheduling, disciplining, and terminating the applicants/temporary employees, the Court finds Plaintiff held a position that directly related to the management policies of BBSI's customers. In sum, the Court finds Plaintiff's position was very similar to the human resource manager described in 29 C.F.R. § 541.203, which is exempt under the FLSA's administrative capacity exception and the "Staffing Manager" in the Department of Labor's Opinion Letter, which the Department opined was likely exempt under the FLSA's administrative capacity exception. Therefore, consistent with the federal regulation and the Department.

### B. Exercise of Discretion and Independent Judgment Requirement

In addition to having a position for which the "primary duty consists of the performance of office or non-manual work directly related management policies or general business operations," to be exempt from the MWA's overtime compensation policy under the administrative capacity short test, the employee's primary duty must have included work "requiring the exercise of discretion and independent judgment." W.A.C. § 296-128-520(d)(4).

ORDER-- *41*

Here, because Plaintiff was tasked with hiring, scheduling, discipline, and termination responsibilities and worked under little supervision, the Court finds Plaintiff's primary duty involved work that required the exercise of discretion and independent judgment.

### c. Conclusion

Because the Court finds Plaintiff's compensation and responsibilities satisfied all of the administrative short test requirements set forth in § 296-128-520(4)(d)'s proviso, the Court concludes Plaintiff was an individual employed by BBSI in a bona fide administrative capacity as the term is used in R.C.W. § 49.46010(5)(c). As a consequence, Plaintiff was exempt from the MWA's overtime compensation requirements and may not pursue her overtime claim against BBSI. Accordingly, Plaintiff's Cross-Motion for Summary Judgment is denied and the portion of BBSI's Motion for Summary Judgment relating to Plaintiff's MWA claim is granted. Furthermore, because the Court finds Plaintiff was exempt under § 296-128-520's administrative capacity short test, it need not address whether Plaintiff was exempt under § 296-128-520's administrative capacity standard test or § 296-128-510's executive capacity exception.

### III. Motions *in Limine*

### A. BBSI's Motion *in Limine*

BBSI moves the Court for an Order excluding three types of evidence: (1) findings and determinations by the ESD; (2) opinions of lay witnesses concerning the motives, acts, or decisions of BBSI management to terminate Plaintiff's employment; and (3) testimony relating to BBSI's filing on this motion. Plaintiff does not object to

ORDER-- *42*

BBSI's first and third requests and only objects to the second request by asserting she has the right to present percipient evidence from lay witnesses of BBSI's motives for terminating her employment.

### 1. ESD Findings & Determinations

Under R.C.W. § 50.32.097,

[a]ny finding, determination, conclusion, declaration, or final order made by the commissioner, or his or her representative or delegate, or by an appeal tribunal, administrative law judge, reviewing officer, or other agent of the department for the purposes of Title 50 RCW, shall not be conclusive, nor binding, nor admissible as evidence in any separate action outside the scope of Title 50 RCW between an individual and the individual's present or prior employer before an arbitrator, court, or judge of this state or the United States, regardless of whether the prior action was between the same or related parties or involved the same facts or was reviewed pursuant to RCW 50.32.120.

Thus, because § 50.32.097 applies to the findings and determinations of the ESD, the parties are prohibited from introducing evidence containing the ESD's findings and conclusions. Accordingly, this portion of BBSI's Motion *in Limine* is granted.

### 2. Opinion Evidence

Here, Plaintiff does not suggest her lay witnesses will be called upon to provide opinion testimony about BBSI's motives for terminating her employment. Instead, Plaintiff indicates she will use lay witnesses only to provide percipient testimony she believes is related to BBSI's reasons for discharging her employment. Accordingly, because Plaintiff does not plan to introduce opinion testimony through lay witnesses, BBSI's second request is denied as moot.

### 3. Testimony Regarding this Motion

Because the fact that BBSI brought this Motion *in Limine* is irrelevant to the issues raised in Plaintiff's discrimination claim, the

ORDER-- *43*

Court grants BBSI's third request and bars Plaintiff from introducing evidence pertaining to BBSI's filing of its Motion *in Limine*. *See* Fed. R. Evid. 401 & 402.

**B. Plaintiff's Motion *in Limine***

Plaintiff moves the Court for an Order excluding six types of evidence: (1) evidence of BBSI's financial status, lack of insurance, or insurance policy limits; (2) evidence of the effect Plaintiff's claim may have on BBSI's insurance premiums; (3) evidence not properly disclosed in disclosed in discovery; (4) evidence of benefits from a collateral source, e.g. unemployment compensation; (5) evidence of Plaintiff's fee agreement with Plaintiff's counsel; and (6) evidence relating to Plaintiff's filing on this motion.  BBSI filed no objection to Plaintiff's Motion *in Limine*.

**1. Insurance-Related Evidence**

Federal Rule of Evidence 411 states:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully.  This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

Consistent with this rule, the parties are prohibited from introducing insurance-related evidence for the purpose of proving or disproving Plaintiff's discrimination claim. Fed. R. Evid. 411.  In addition, because evidence of BBSI's lack of insurance, policy limits, or effects on insurance premiums by this action is irrelevant to the discrimination claim, this evidence is generally excluded under Federal Rules of Evidence 401 and 402.

**2. BBSI's Financial Status, Attorney Fee Agreements, & This Motion**

ORDER-- *44*

Because evidence of BBSI's financial status, Plaintiff's fee agreement with Plaintiff's counsel, and the fact that this motion was filed is irrelevant to Plaintiff's discrimination claim, all such evidence is excluded under Federal Rules of Evidence 401 and 402.

### 3. Evidence Improperly Withheld During the Discovery Process

Evidence improperly withheld during discovery may not be introduced during the trial without obtaining prior consent of the Court, which will be given only upon a showing of good cause out of the presence of the jury.

### 4. Collateral Source Evidence

Under Washington law, evidence of benefits from a collateral source, such as unemployment compensation benefits, are inadmissible. *Stone v. City of Seattle*, 64 Wash. 2d 166, 172 (1964) ("It is well established that the fact a plaintiff receives, from a collateral source, payments of this nature which have a tendency to mitigate the consequences of the injury that he otherwise would have suffered, may not be taken into consideration when assessing the damages the defendant must pay.") (citation omitted). Thus, this portion of Plaintiff's Motion *in Limine* is granted.

### IV. Objection to Plaintiff's Proposed Exhibit No. 22

On April 7, 2006, Plaintiff notified BBSI and the Court of her intent to introduce an ESD document titled "Notice to Employer - Claimant's Separation Statement" (Ct. Rec. 48 Ex. 15), which was labeled as Plaintiff's proposed Exhibit No. 22. On April 13, 2006, BBSI objected to the introduction of Plaintiff's proposed Exhibit No. 22, claiming the document is inadmissible (1) under R.C.W. § 50.32.097

ORDER-- *45*

because it was issued by the ESD and (2) because it is irrelevant to Plaintiff's claims in this action. (Ct. Rec. 44.)

BBSI's objection is overruled.  First, because the "Notice to Employer - Claimant's Separation Statement" does not contain any findings, conclusions, or determinations by the ESD or the state, its admission is not bared by § 50.32.097.  Second, as noted above, because the answers provided by Mr. Krug in the document are relevant to the issue of whether Plaintiff was terminated for reasons other than those now given by BBSI, Plaintiff's proposed Exhibit No. 22 is relevant. Accordingly, Plaintiff's proposed Exhibit No. 22 may be introduced as evidence during trial.

Accordingly, **IT IS HEREBY ORDERED:**

1.  BBSI's Motion for Summary Judgment **(Ct. Rec. 21)** is **GRANTED IN PART** (collateral estoppel argument, breach of specific promises claim, and overtime claim) and **DENIED IN PART** (discrimination claim).

2.  Plaintiff's Cross-Motion for Partial Summary Judgment **(Ct. Rec. 32)** is **DENIED.**

3.  BBSI's Motion *in Limine* **(Ct. Rec. 42)** is **GRANTED IN PART** (evidence of ESD conclusions & the filing of this motion) and **DENIED AS MOOT IN PART** (opinion evidence by lay witnesses).

4.  Plaintiff's Motion *in Limine* **(Ct. Rec. 45)** is **GRANTED.**

///

///

///

///

ORDER-- *46*

5. BBSI's Objection to Plaintiff's Proposed Exhibit No. 22 **(Ct. Rec. 44)** is **OVERRULED.**

**IT IS SO ORDERED.**   The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this ___6th___ day of June 2006.


                        ___S/ Edward F. Shea___
                            EDWARD F. SHEA
                    UNITED STATES DISTRICT JUDGE

Q:\Civil\2005\0104.MSJ.PTC.wpd

ORDER-- *47*